ORIGINAL

E-filing

# PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name   BURLESON        JESSE         C
      (Last)          (First)       (Initial)

Prisoner Number   D-90284

Institutional Address   PO BOX 409020,   IONE, CA 95640

**FILED**

APR - 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JESSE CLYDE BURLESON,
(Enter the full name of plaintiff in this action.)

      vs.

DIRECTOR, CALIFORNIA

DEPARTMENT OF CORRECTIONS

AND REHABILITATION

_____
(Enter the full name of respondent(s) or jailor in this action)

08  1853  SBA

Case No. _____
(To be provided by the clerk of court)

PETITION FOR A WRIT
OF HABEAS CORPUS (PR)

Read Comments Carefully Before Filling In

### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located. If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS       - 1 -

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14          CALIFORNIA SUPERIOR COURT       SAN FRANCISCO

15              Court                          Location

16          (b)    Case number, if known ___125509_____ ±

17          (c)    Date and terms of sentence _JULY 1, 1988, 15 to life;10_

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

                          yrs consecutive

19              parole or probation, etc.)        Yes _X_   No _____

20              Where?

21              Name of Institution: ___Mule Creek State Prison___

22              Address_PO Box 409020, Ione, Ca 95640___

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  _15 yrs to life for second degree murder, 5 yrs for attempted_

27  _murder, 3 yrs for GBI, and 2 yrs for gun use._____

28  _____

3. Did you have any of the following?

Arraignment:            Yes __✓__    No _____

Preliminary Hearing:      Yes __✓__    No _____

Motion to Suppress:      Yes _____    No __✓__

4. How did you plead?

Guilty _____    Not Guilty __✓__    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury __✓__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?          Yes _____    No __✓__

7. Did you have an attorney at the following proceedings:

     (a)    Arraignment             Yes __✓__    No _____

     (b)    Preliminary hearing     Yes __✓__    No _____

     (c)    Time of plea            Yes __✓__    No _____

     (d)    Trial                  Yes __✓__    No _____

     (e)    Sentencing           Yes __✓__    No _____

     (f)    Appeal               Yes __✓__    No _____

     (g)    Other post-conviction proceeding    Yes _____    No __✓__

8. Did you appeal your conviction?        Yes __✓__    No _____

     (a)    If you did, to what court(s) did you appeal?

            Court of Appeal           Yes __✓__    No _____

            Year: _1988-89_    Result: _Affirmed sentence_

            Supreme Court of California    Yes _____    No __✓__

            Year: _____    Result:_____

            Any other court           Yes _____    No __✓__

            Year: _____    Result:_____

     (b)    If you appealed, were the grounds the same as those that you are raising in this

1        petition?                                          Yes _____     No ✓_____

2        (c)    Was there an opinion?                       Yes ✓_____    No_____

3        (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                           Yes _____     No ✓_____

5               If you did, give the name of the court and the result:

6               _____

7               _____

8    9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?        Yes ✓_____    No_____

10        [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition.  You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15   U.S.C. §§ 2244(b).]

16        (a)    If you sought relief in any proceeding other than an appeal, answer the following

17               questions for each proceeding.  Attach extra paper if you need more space.

18        I.     Name of Court: Superior Court of Conviction

19               Type of Proceeding: Habeas Corpus

20               Grounds raised (Be brief but specific):

21               a. IAC

22               b. failure to instruct

23               c. Juror Misconduct

24               d. _____

25               Result: Denied                Date of Result: 7

26        II.    Name of Court: Court of Appeal, California

27               Type of Proceeding: Habeas

28               Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1    a. _____(Same as above)_____

2    b. _____

3    c. _____

4    d. _____

5    Result: __Denied_____ Date of Result: __?___

6    III.    Name of Court: __Cal. Supreme Ct__

7    Type of Proceeding: ____Habeas_____

8    Grounds raised (Be brief but specific):

9    a. ____(Same As above)_____

10    b. _____

11    c. _____

12    d. _____

13    Result: __Denied_____ Date of Result: __?___

14    IV.    Name of Court: __Cal. Supreme Ct.__

15    Type of Proceeding: ____Habeas_____

16    Grounds raised (Be brief but specific):

17    a. __The grounds raised in this__

18    b. __Federal petition were most,__

19    c. __recently Raised in the Cal Supreme__

20    d. __Ct.__

21    Result: __Denied_____ Date of Result: __01/23/08__

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes_____    No__✓__

24    Name and location of court: _____

25    B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27    support each claim. For example, what legal right or privilege were you denied? What happened?

28    Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1    need more space.  Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3    petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:_____( Please see attached [inserted] pages.)

6        _____Page 1 - 6.

7        Supporting Facts:_____

8        _____

9        _____

10       _____

11       Claim Two:_____

12       _____

13       Supporting Facts:_____

14       _____

15       _____

16       _____

17       Claim Three:_____

18       _____

19       Supporting Facts:_____

20       _____

21       _____

22       _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   ___All claims asserted herein were presented to

26   the state's highest court.

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

## INTRODUCTION

Petitioner is technically procedurally barred under the AEDPA from filing any claims in challenge to his state convictions - this is his first federal habeas petition - however, the dismissal of his petition would produce a miscarriage of justice, because newly presented evidence demonstrates that petitioner is actually innocent of second degree murder (a malicious homicide) and attempted murder (attempted malicious homicide). And petitioner's claims should therefore be reviewed on their merits under the "gateway" standard. Griffin v. Johnson, 350 F3d 956 (9th Cir 2003).

## CLAIMS

Petitioner is actually innocent of second degree murder and attempted murder and suffers from an unconstitutional conviction because:

1) the trial judge failed to exercise discretion compelled by law to instruct the jury that it must consider the evidence presented that petitioner had acted without malice when deciding the material issue of malice aforethought.

2) trial counsel failed to render reasonably adequate assistance which directly resulted in petitioner being wrongfully convicted of homicide with malice, by failing to conduct an investigation of petitioner's desired viable defense, and by his unreasonable waiver of judicial duty to have the jury instructed to consider the mitigating circumstances evidence presented of unreasonable self-defense.

3) the jury was prevented from performing its fact-finding duty of considering the evidence that demonstrates petitioner had acted without the element of malice aforethought in unreasonable self-defense.

## FACTS

1.        On friday, September 25, 1987, 18 year old petitioner was taken into custody for a warrant in San Francisco due to his having unpaid traffic tickets. Petitioner was held in custody until the evening of the following day, Saturday, September 26, and was released on his own recognizance with instruction that he appear in court that coming Monday, September 28. (County Records)

2.        Upon his release, petitioner learned that while he was in custody one of his associates had beaten up another young man named Dodie. And that Dodie's uncle, Charles "Little Charles" Harris (Harris), believed that petitioner was responsible for what happened to Dodie and was looking for petitioner.

3.        Petitioner was involved in small time illegal drug peddling, as were some of his associates. Dodie had owed petitioner money, and Dodie had owed petitioner's associate money also. Dodie was assaulted by petitioner's associate which occurred in the presence of Dodie's girlfriend. Dodie's girlfriend was aware that Dodie had owed petitioner money, however, was unaware that Dodie had owed petitioner's associate money also. The girlfriend, assuming that petitioner must have sent his associate to beat up Dodie because of the unpaid debt, misinformed Dodie's uncle.

*1*

4.      On Sunday night, September 27, petitioner encountered Harris on Leavenworth street between Turk and Eddy. Petitioner told Harris he had nothing to do with what happened to Dodie but Harris physically assaulted petitioner. During the incident petitioner picked up a pole to defend himself and Harris's girlfriend, Christine Farrard (Farrard), jumped in and petitioner pushed her back by her face. Harris threatened to have petitioner killed, then Harris left the area with Farrard.(Exh. A1 - A6)

5.      Later that evening Dywayne Richrdson (Richardson, a friend of petitioner who was initially taken into custody as a suspect) informed petitioner that he believed Mark Ellis (Ellis, attempt victim) and the men with Ellis; Clarence "Popeye" Stevenson (Stevenson, deceased victim), Jesse James Jackson (Jackson, eyewitness and the self-alleged god-son of Stevenson), Johnny Reed (Reed, witness), and Gary Davis, were coming to kill petitioner for Harris.

6.      Richardson told petitioner Harris had returned and that he saw him give a gun to Ellis. He said that the exchange took place on Eddy street between Leavenworth and Jones, and that he should watch his back. (Exh. A7 - A10)

7.      Petitioner was familiar with the men from around the neighborhood and became afraid for his life and went to his apartment to arm himself. Petitioner resided with his girlfriend and their 10 month old daughter at the Piedmont Apartments at 270 Turk street between Leavenworth and Jones, just parallel to and one block over from Eddy street where Richardson told him the men were at. From his apartment petitioner telephoned his friend Bencel Bautista (Bautista) to let him know that he was in trouble. Bautista told petitioner he was going to his girlfriend's house to attend a birthday party for his girlfriend's sister and that he would drive through Turk street on his way there. Petitioner said he would wait for him outside.

8.      Petitioner waited for Bautista at the north-east corner of Turk and Leavenworth. Bautista's car arrived and stopped in the bus zone across the street at the north-west corner of Turk and Leavenworth. Petitioner went to the car and spoke to Bautista. He told Bautista that a contract had been made to have him killed and that the men were coming for him. He told Bautista he was thinking of moving back to Texas and live with his father to get away from all the danger he was in. Petitioner had recently moved back to California from Texas the year before, in 1986. Petitioner asked Bautista to stay there with him but Bautista told petitioner he would come back because he had to go to his girlfriend's house first. His girlfriend, Antonique Shelton (Shelton, witness) was with him inside the car. (RT 329-332, 628 - 632)

9.      When Bautista left petitioner went back to his apartment and would go back outside periodically checking for Bautista's car. Petitioner would walk to the north-east corner of Turk and Leavenworth to look out for Baustist'a car. Once while outside petitioner noticed that Ellis and his crew had congregated together across the street at the north-west corner of Turk and Leavenworth. Then at approximately 11 p.m. petitioner encountered Ellis and his crew directly outside the entrance gate of his apartment building at 270 Turk. Petitioner panicked, drew his gun, and started firing. Petitioner shot Ellis at point blank range and fired rounds at the other men as they fled, hitting Stevenson twice, one shot fatally wounding him. Petitioner then fled himself.(Ex. A5-A6)

2

10.    The next morning, Monday, September 28, petitioner kept his court appointment at 850 Bryant Street and was taken into custody when he appeared there for the traffic related matters. He was advised by the attorney appointed to represent him on the traffic issues to not give any statements regarding the shooting incident. Petitioner followed the attorney's advice and gave no statement to police.

11.    Petitioner later hired a criminal defense attorney. Petitioner informed defense counsel of everything that took place and said he would like to testify on his own behalf so that he could explain what had happened. Counsel told petitioner not to testify because he was going to argue a case of misidentity because he didn't believe there was enough evidence to prove that he did the shooting. Counsel told petitioner that he based his decision on his review of the police reports containing the statements of all potential witnesses. He said the witness statements were inconsistent and inconclusive as to who or what they saw. And that no one clearly identified him. Counsel said he didn't need to interview all of the persons that could corroborate or substantiate what petitioner had told him regarding his belief in the need to act in self-defense because he wasn't going to need them. (Exh. A11, A13 - A17)

12.    Counsel did not interview Jackson either, the alleged godson of the deceased victim who was standing with Ellis and Stevenson when the shooting occurred. Counsel said he assumed that Jackson would not be a witness since his initial statement to police was that his back was turned when the shots were fired and that he didn't see who did the shooting. (Exh. A12, RT 546 - 549)

13.    At trial the prosecution presented the testimony of Bautista and Shelton, and of the homicide detective (Inspector Edward Kenney) who interviewed them, to recount the conversation petitioner had with Bautista on the night of the shooting. The prosecution argued that petitioner had a "motive" for shooting Ellis and Stevenson because he believed that they were supposed to kill him in the fulfillment of a contract made against him. (RT 329-332, 628-632)

14.    The prosecution also presented a jailhouse informant, Don Carlos Rhodes (Rhodes), to testify that he heard petitioner telling someone in the county jail that he shot "Popeye" (Stevenson) because he believed Stevenson was going to try to kill him. The prosecution argued that the basis for petitioner's actions was his belief that Ellis and Stevenson were hired to kill him but that petitioner's belief was mistaken as to Stevenson and Ellis. (RT 102-103, 501-503, 669-672, 696-697)

15.    Ellis testified that the only reason he was standing at 270 Turk street was because Reed lived there and Stevenson was buying a hyperdermic syringe from Reed. Ellis testified that he was with Reed and Reed went inside to get the needles for Stevenson. Ellis testified that he did not personally know petitioner and that he did not know Stevenson either and did not know why petitioner would want to shoot him other than mistaking him for being someone else. (RT 146-150, 186-187)

16.    The prosecution also presented the testimony of Jackson, Reed, Bruce Riggs (Riggs), and Eileen Nicholson (Nicholson), to identify petitioner as the shooter. However it was Jackson's testimony that compelled the result of positive identification. Jackson

testified that he was standing next to Ellis: "When he (petitioner) came out of the Piedmont Apartments, he had a gun and he said, "You motherfucker," ba m and shot Mark (Ellis)". (456-472)

17.    Reed testified that he was about to exit the building when he heard shots outside and when he came out he saw Ellis on the ground and petitioner running away with a gun in his hand. Riggs testified that he was across the street when he saw petitioner firing a gun at two men who were running in his direction. And Nicholson testified that she heard the shots and then saw petitioner pass by her with a gun in hand. (RT 267, 274 (Riggs), 354-355 (Reed), 418 (Nicholson).)

18.    Defense counsel attacked these testimonies on the inconsistencies in their descriptions of what the petitioner was wearing; hat versus no hat, glasses versus no glasses, estimated age of petitioner versus actual age, estimated height and size of petitioner versus actual height and size, description of gun type (automatic versus revolver).

19.    At the conclusion of the presentation of evidence, and outside  the presence of petitioner, the trial judge inquired whether counsel was willing to "waive" the trial court's consideration of giving lesser included voluntary manslaughter offense jury instructions. And counsel so agreed to waive the court's function. (RT 639-640)

20.    The jury received only murder instructions, that is, malicious homicide, with an instruction that it may consider petitioner's "motive" only as it related to whether petitioner's conviction should be of the first or second degree; both being malicious homicides.

21.    No instruction was given to inform the jury that it may consider petitioner's "motive" as it related to the element of malice; that is, no instruction was given to inform the jury that in order for it to find the element of malice in the case that it had to find, first, that petitioner did not act in unreasonable (or mistaken belief) self-defense.

22.    The jury resolved the identity issues against petitioner and convicted him of second degree murder and attempted murder.

23.    At sentencing the trial judge noted petitioner's motive  as a mitigating factor, however, no argument was made by counsel that petitioner's convictions should be reduced to non-malicious homicide because of it. (RT 765)

ARGUMENT

A.    Petitioner asserts that due process required the jury to  have been instructed to consider petitioner's belief as it related to the element of malice and that had the jury been allowed to consider petitioner's belief it would have exonerated him of malicious homicide, finding him guilty of no greater offense than voluntary manslaughter (non malicious homicide).

*4*

California law compels trial courts to instruct a jury that evidence presented that a defendant may have acted in unreasonable self-defense must be disproved by the prosecution in order for the element of malice to be established. People v. Flannel (1979) 25 C.3d 668; People v. Rios 97 CR2d 512, 520-521 (Cal. 2000); CALJIC 5.17, 8.40, 8.50.

The trial judge in this case committed an abuse of discretion by failing to exercise the discretion compelled by law to consider instructing the jury that it must consider the evidence presented that petitioner had acted without malice in unreasonable self-defense when deciding the material issue of malice aforethought. (RT 639-640)

Due process dictates that when a judge fails to exercise a discretion compelled by law that a fair hearing has been denied and the judgment must be reversed or remanded.

In order to establish malice where mitigating circumstances have been presented that tend to negate malice, due process requires the prosecution to disprove the mitigating circumstances. This was not done and the failures violated federal due process. Mullaney v. Wilbur (1975) 421 US 684, 704; In re Winship (1970) 397 US 358, 364; confer People v. Rios, supra, 97 CR2d at 520.

In the absence of informing instructions the jury was prevented from performing its fact-finding duty - on deciding the critical and essential element of malice under the required standard of proof. Also, the lack of instruction relieved the prosecution of its burden to prove the malice element under the required standard.

Furthermore, the state concedes the point that this was only a case of unreasonable self-defense, as the prosecutor exhorted at trial:

"the evidence will show that the defendant thought they were two hitmen or two people from St. Louis who were out to get him, to kill him" (RT 103, Prosecutor's opening statements to jury)

"Is there motive in this case? Abundant motive and it supplies the whole basis to why this occurred... The defendant thought this was one of the guys that was from out-of-town." (RT 697, Prosecutor's closing argument to jury)

Based on the evidence never considered by the jury on the material issue of malice, and the prosecution's case-in-chief, petitioner is actually innocent of malicious homicide under California law.

B.      Petitioner asserts that counsel's waiver (of judicial duty) was an unreasonable and incompetent act in the context of this case, since not having the jury instructed to fully consider the prosecution's case (on an essential element) was inconsistent with due process, denying petitioner a fair hearing on all material issues raised by the evidence, and would not have affected counsel's argument on the identity issues.

C.      Counsel's failure to investigate, counsel's pre-investigative decision to present a misidentity defense, and his unreasonable waiver at trial, contributed to, if not directly caused, petitioner's wrongful conviction.

It was "unreasonable" for counsel to rely on police reports (Lord v. Wood,

184 F.3d 1083. 1084 (9th Cir 1999)) and counsel's decision to present a misidentity defense without first conducting an adequate investigation of the viable defense of unreasonable self-defense constituted deficient performance. Rios v, Rocha, 299 F.3d 796 (9th Cir 2002).

Counsel failed to interview Shanelle Brown, Dywayne Richardson, Shante Spruell, and even Bautista and Shelton.

However, it was counsel's failure to interview Jackson, the key eyewitness for the prosecution, that constituted a deficiency in performance that ranks highest in prejudice in petitioner's view. See United States v. Tucker, 716 F.2d 576, 584 (9th Cir 1983)

Counsel had assumed that Jackson would not testify based on the police report indicating Jackson had initially told police that his back was turned. However, Jackson testified that at some point he did inform the authorities that he witnessed the shooting. (RT 472) Jackson was a major part of the prosecution's case, which without Jackson's testimony, counsel's misidentity theory had a chance.

However, counsel relied on the police report of Jackson's initial statement to assume Jackson would not come forth. Then when Jackson testified that he witnessed the shooting, counsel was unprepared and his misidentity defense was severely compromised. Counsel was left with no alternative but to continue with his now obviously weak misidentity argument, because not only did he not see Jackson's testimony coming, but he had failed to interview the persons who could have supported the more viable defense of unreasonable self-defense in the event he needed to change his defensive strategy. However, counsel failed to adequately prepare for this murder trial.

Even without that being the case, the prosecution's case still supported a claim of unreasonable self-defense when it presented that petitioner had only acted upon his mistaken belief in the need to defend himself from Ellis and Stevenson. However, when the opportunity arose for counsel to have the jury instructed to consider the lesser offense of manslaughter – in the event the jury had decided to reject the identity issues raised by counsel (which it did) – counsel decided to waive that opportunity away for no forseeably good reason  by his acquiescence to waive the court's duty to instruct the jury on the lesser offense categories of manslaughter.

Petitioner submits that since none of the unreasonable self-defense evidence was ever considered by the jury on the relevant issue of malice, that the evidence of petitioner's belief and the circumstances surrounding it constitutes "newly presented evidence" for federal habeas review. See, Griffin v. Johnson, 350 F.3d 956.


CONCLUSION


Petitioner requests that his case, evidence and claims, be reviewed under the standard of actual innocence to overcome any procedural default; that he be afforded an evidentiary hearing on any disputed issues of material fact; that he be appointed counsel, if deemed necessary; and that relief be granted in the form of either the reversal of his convictions, or an order entered modifying petitioner's convictions from murder and attempted murder to voluntary and attempted voluntary manslaughter.

1         List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    Griffin v. Johnson, 350 F3d 956 (9th Cir 2003); Mullaney v. Wilbur (1975) 421

5    US 684; In re Winship (1970) 397 US. 358; People v. Rios, 97 CR2d 512,

6    (Cal. 2000); People v. Flannel, 25 C.3d 668 (Cal. 1979); CAL JURY INSTRUCTIONS CALJIC 5.17, 8.40, 8.50

7    Do you have an attorney for this petition?                    Yes_____    No √

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on ___March 22, 2008___                    _____

14             Date                                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

**EXHIBIT**S  A1 – A17

Thus. 8 oct 87
0810.

Interview with
CHARLES HARRIS . AKA LITTLE CHAS.
NM . 6/10/59   2505 Tombard #31.
No Phone in Room).

Stated that he was not involved in shooting,
nor was he in the area when it happened.
He was involved in a fight . 4 or 5
hours earlier with Jessie.
Jessie had a fight a few days earlier
with Chas Harris' nephew Derrick Harris.
This fight was over the girl that Derrick
Harris is dating (Theresa NF - 16-17 yrs. thin)
He beat Derrick up and told him not to
come down to the T/L again. -
Charles Harris got into an arguement with
Jessie over this and in the arguement Jessie
slapped his woman (Christine Farrand). She got
slapped because she was trying to take a
stick away from Jessie as he was going to
hit Chas. Harris. - Jessie backed down because
Jason (NM 16-17 BB) was behind him, backing
him up. - Then it was over with. Chas.
Harris and Jessie talked and Chas Harris &
Christine left and didn't come back to the

T/L that night. Ches Harris does know Popeye but he doesn't know or recognize Mark. I know Popeye and there is no way anybody could mistake me for him. —

Found out about the killing from his woman Christine who woke him up in the night and told him. She found out from his family who saw it on the news at 11 or 12 — Denied that he had payed anyone any money to "take care" of Jessie. — Said that they were more or less friends and he would have no reason to do that.

Kenny,

Exhibit A2

7 Oct 87
5 20 pm.

Interview w/ Christine Farrord.
WFA 19 yrs. 11/19/67
2505 Lombard #31.   921 2505
or 1317 Gateview Ave; Treasure Island.
@ mother's BOYFRIEND Setsuko Hoy - No phone.
mother is NORIKO ROWLINGS

States that she was down in the T/I earlier
in the day but not during the shooting.
There was a fight. She was about to jump
on her boyfriend Chas. Harris. & she saw Jessie
come from around the corner with a
pole in his hand and use it like a baseball
bat against her boyfriend - She went over to
Jessie and tried to get the pole away from him
and Jessie slapped her across the face.
Chas Harris got mad and he and Jessie
had words and then they left the area.
They didn't come back to the T/I that
night at all.

13 oct 87.

Interview with
Tracy Kelley.
240 Turk St #1003.

Stats that at the time of the shooting she
was just entering her apt #1003 and heard
the shots. She then went to the window and
looked out. She was with her friend
Lisa atkins.

She heard later "on the street" that Jessie
did it. She was shocked; Jessie is a good friend
of hers. - so is his girl friend Alice; She has
never seen him with a gun.

- Regarding a fight earlier that
afternoon - "Dosie" (her boy friend - 1166 Pine #2)
& "Kilo" were fighting on the corner of
Turk & Leavenworth. - Kilo lives somewhere
out on Fulton St. She doesn't know what
that fight was about. It wasn't over her.

Exhibit A4

Shante D. Spruell                    10-7-87
NF  9-11-69                          5:25 pm
237 Leavenworth  #105    441-4644


On the night Popeye got shot Jesse and
"little Charles" got into a fist fight at
about 9 pm. "Kilo", who is a friend of Jesse's,
hit "Dodie" and Dodie is little Charles'
cousin. Dodie blamed Jessie for Kilo having
hit him. Later, about 10 pm, I saw Jessie
at the corner of Turk & Leavenworth. He
had his hands in his pockets, he
was pacing back and forth and he was
nervous. I asked him what was wrong
and he told me "these niggas are
going to kill me". He pointed across
the street to a group of people
that included Mark and "JJ."
Jesse then left and about 15 minutes
later while I was in front of my
building I heard shots. Little
Charles and Dodie (NM 19, 5'7, 135)
are from St. Louis. Two or three
days after the shooting his friend, Carl,
NM 17 yrs., told me that Jesse
thought that Little Charles and Kilo

had hired some guys to shoot him. Carl also told me that Jesse thought that Mark was one of the guys that had been hired to shoot him. Carl also quoted Jesse as saying that he shot Popeye because he was standing near Mark and that it was an accident. Carl lives in the Laguna & McAllister area. Kilo's real name is Kennen and he was arrested a couple of days ago in front of the Jefferson for selling hubas.

Exhibit A6

Dywayne D. Richardson
NM 10-2-62
620 Eddy #8        673-4250
SF# 410304

*9-28-87*
*Taped*

Originally detained by officers Martin #1157
and Ragona #1216

---

RICHARDSON, DYWAYNE D.
N/M, 10-2-62
SF # 410304

5'8", 145, BRO. BRO.
10-35.
620 Eddy #8

TAN RACOON TYPE HAT
PURPLE COLORED JACKET
GREEN WITH WHITE & BLACK
STRIPES IN BACK PANTS.
BLK. TENNIS SHOES.

3A31   MARTIN #1157
       RAGONA #1216

Exhibit A7

| INCIDENT NO. | | | | | ESSENTIAL SUPPLEMENTARY | BOOKED | DOMESTIC VIOLENCE | STATEMENT TAKEN | ASSIGNED (RECORD ROOM USE ONLY) |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 7 | 1 | 0 | 8 6 4 9 8 2 | □ CITED | □ CITED | YES (NO) | YES (NO) | |

| TYPE OF INCIDENT | M.O. CODE | UNIT RPTG | DATE(S) & TIME(S) OF OCCURRENCE |
|---|---|---|---|
| ASSAULT W/DEADLY WEAPON (GUN) HOMICIDE | | 3A1 | 9-27-87 2300 |

9-21-87, 2:00    1-?-?, 2:40    PERRY #595

| LOCATION OF OCCURRENCE | LOCATION SENT TO | TYPE OF PREMISE |
|---|---|---|
| 270 TURK | SAME | PUBLIC STREET |

| REPORTING OFFICER | STAR | REPORT APPROVED BY | STAR | HOW CLEARED (RECORD ROOM USE ONLY) |
|---|---|---|---|---|
| STOCKER | 2196 | SGT. ??? | 742 | |

CTIM CODES: **V** - VICTIM. **R** - REPORTEE. **W** - WITNESS. **P** - PARENT. **N** - NOTIFY. **F** - FOUND. **M** - MISSING

| CODE | NAME (LAST, FIRST, MIDDLE) | RACE W (N) I C | SEX | DOB OR AGE | RES. PHONE | BUS. PHONE |
|---|---|---|---|---|---|---|
| V1 | STEVENSON, CLARENCE | J OTHER UNK | M | 10-12-31 | | |

| RESIDENCE ADDRESS | BUSINESS ADDRESS | VICTIM OF CRIME NOTIFICATION |
|---|---|---|
| 324 HAIGHT | | ☐ YES ☐ NO STAR: |

| OTHER INFORMATION / MISSING PERSON INFORMATION | REPORTEE FOLLOW-UP NOTIFICATION ☐ YES ☐ NO |
|---|---|
| DECEASED | |

| CODE | NAME (LAST, FIRST, MIDDLE) | RACE W (N) I C | SEX | DOB OR AGE | RES. PHONE | BUS. PHONE |
|---|---|---|---|---|---|---|
| V2 | ELLIS, MARK | J OTHER UNK | M | 8-18-58 | 334-7779 | |

| RESIDENCE ADDRESS | BUSINESS ADDRESS | VICTIM OF CRIME NOTIFICATION |
|---|---|---|
| 1207 SUNNYDALE | | ☐ YES ☐ NO STAR: |

| OTHER INFORMATION / MISSING PERSON INFORMATION | REPORTEE FOLLOW-UP NOTIFICATION ☐ YES ☐ NO |
|---|---|
| | |

ISPECT CODES: **A** - ADMONISHED: **B** - BOOKED: **C** - CITED: **D** - DETAINED: **E** - EXONERATED: **S** - SUSPECT, **X** - DIVERTED

| CODE | NAME (LAST, FIRST, MIDDLE) | RACE W (N) I C | SEX | DOB OR AGE | ALIAS |
|---|---|---|---|---|---|
| D1 | RICHARDSON, DYWAYNE | J OTHER UNK | M | 10-2-62 | |

| HEIGHT | WEIGHT | HAIR COLOR BLK BLN (BRO) GRY SANDY RED BALD WHI UNK | EYE COLOR BLK BLU (BRO) GRY GRN HAZ MIXED UNK | ADDRESS |
|---|---|---|---|---|
| 5-8 | 145 | | | |

| WARRANT / CITATION # | BOOK/CITE SECTION |
|---|---|
| | |

| WHERE BOOKED | BOOK/CITE APPROVED BY | STAR | I.D. # (SOC. SEC.. OP. LIC.. ARMY SER. #. ETC.) |
|---|---|---|---|
| | | | SF # 410304 |

| WHEN & WHERE CITED TO APPEAR / OTHER INFORMATION / ADDITIONAL DESCRIPTION OF SUSPECT |
|---|
| DETAINED AT CENTRAL STATION, INTERVIEWED AT HOMICIDE BY INSP. ERDELATZ |

EHICLE CODES: **F** - USED FELONY: **U** - USED OTHER: **S** - STOLEN: **R** - RECOVERED: **B** - BOOSTED: **D** - STRIPPED: **T** - TOWED: **P** - STOLEN PLATES. **L** - LOST

| CODE | LICENSE PLATE NO. | STATE | YEAR | TYPE | VIN | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| CONDITION WHEN RECOVERED: 1 APPARENTLY DRIVEABLE 2 ENGINE & TRANSMISSION MISSING 3 ENGINE MISSING 4 TRANSMISSION MISSING 5 BURNED 6 WRECKED 7 OTHER STRIPPED | PLATES MISSING 1 2 NONE | TOW CHECK (NAME) | WAIVER SIGNED YES NO |
|---|---|---|---|

| OTHER INFORMATION |
|---|
| |

ROPERTY CONDITION CODES: **S** - STOLEN: **R** - RECOVERED: **L** - LOST: **E** - EVIDENCE; **F** - FOUND: **P** - PROPERTY FOR SAFEKEEPING: **D** - DAMAGE

| CODE | PROPERTY DESCRIPTION | VALUE |
|---|---|---|
| F/E1 | 1 BALLOON CONT. SUBSTANCE | |
| F/E2 | NUMERUS PAPER BINDLES CONT. SUBSTANCE | |
| | | |
| | | |

ELOW INCLUDE ADDITIONAL HEADING, VICTIMS, SUSPECTS, VEHICLES AND / OR PROPERTY BEFORE BEGINNING NARRATIVE.

S2: NM, 20-25 YRS, 5-7, 140, BRN, BRN, DARK COMPLECTED,

BLUE JEANS, BLACK JACKET

NARRATIVE:

OFF. NEWMAN #1315 AND I RESPONDED TO THE ABOVE PLACE AND TIME

| | I/CSS ENTRY BY: |
|---|---|
| PAGE 1 OF 2 | SFPD 37 (4/87) |

Exh. A8

REGARDING A CALL OF A SHOOTING. UPON ARRIVING, WE DISCOVERED

(1) STEVENSON LYING AT THE CORNER OF TURK AND LEAVENWORTH WITH

MULTIPLE GUNSHOT WOUNDS. 3E4, OFF. LEVINE AND HOUSEHOLDER, AND

AMBULANCE UNIT 1H81, STEWARD HAGOPIAN #389, WERE ALREADY AT THE SCENE.

(V2) ELLIS WAS LYING ON THE SIDEWALK AT 270 TURK WITH A GUNSHOT

WOUND TO HIS JAW; AMBULANCE UNIT 1H83, STEWARD PARKOFF #500, WAS

TREATING HIM. 3A200, SGT. VELASQUEZ #792, ALONG WITH OFF. BARRY #2093,

ARRIVED AND TOOK CHARGE OF THE SCENE. THE AMBULANCES TRANSPORTED THE

VICTIMS TO MEH. THE CRIME SCENES WERE PRESERVED.

(W3) COOKS FLAGGED DOWN UNIT 3793, OFF. MCKENNA #1512, AND

STATED THAT HE HAD BEEN WALKING N/B ON HYDE TOWARD TURK WHEN HE

HEARD APPROX. 5 GUNSHOTS. SHORTLY THEREAFTER, HE SAW (D) RICHARDSON

& ANOTHER SUSPECT RUN PAST HIM FROM THE CORNER OF TURK AND LEAVENWORTH.

UPON TELLING THIS TO OFF. MCKENNA, COOKS SAW THAT RICHARDSON WAS NOW

STANDING ON THE N/W CORNER OF TURK AND LEAVENWORTH. 3A31, OFF. MARTIN AND

ICONA, DETAINED RICHARDSON AND TRANSPORTED HIM TO CENTRAL STATION.

RICHARDSON WAS LATER INTERVIEWED BY INSPECTOR ERDELATZ #92 (SH 92).

AT THE CRIME SCENE, OFF. SCHOENSTEIN #176 (CRIME LAB) RESPONDED

AT 0010 HRS. INSPECTOR ERDELATZ (SH9) ARRIVED AT 0015 HRS AND TOOK CHARGE OF

THE SCENE. OFF. PETER #127 (PHOTO LAB) ARRIVED AT 0100 HRS.

AT MEH, DR. LEVINE TREATED ELLIS. DR. DABADGUAK TREATED

STEVENSON AND FOUND (F/E1) IN STEVENSON'S MOUTH AND (F/E2) IN HIS

RECTUM. THE ITEMS SEIZED, BOOKED AND HAND-CARRIED TO 850 BRYANT

BY OFF. BARRY. APPROXIMATELY 9-28-87, 0015 HRS, DR. DABADGUAK PRONOUNCED

DEATH ON STEVENSON.

W3: COOKS, JEROME    NM 2-14-55, HOTLINE HOTELS

SH200   SH528   0100/1

PAGE ___ OF 2

ICSS ENTRY BY:

# DECLARATION OF DYWAYNE RICHARDSON

1.  I, Dywayne Richardson, currently reside at 2257 Bridle wreath. Lane LV. NV

2.  On September 27, 1987, I watched Charles Harris aka Little Charles assault Jesse Clyde Burleson on Leavenworth Street.

3.  During the assault, I saw Jesse pick up a steel pole in defense of himself against Charles.

4.  Before leaving with his girlfriend, Christine Farrard, Charles threatened Jesse that he was going to kill him.

5.  My understanding was that this incident happened because Charles' nephew Derrick Harris aka Dodie was beaten up by someone the day before and Charles believed that Jesse was the person who did the beating.

6.  On September 27, 1987 after the assault on Jesse, I saw Charles talking with several men on Eddy and Leavenworth.

7.  It appeared to me that Charles gave a handgun to one of the men.

8.  The group of men included Jesse James Jackson aka JJ and Clarence Stevenson aka Popeye.

9.  It was my belief that Charles was going to have these men kill Jesse.

10. Shortly thereafter I told Jesse what I had seen and that I believed that they were coming to kill him.

11. I am willing to testify to the foregoing before a court of law.


I declare under the penalty of perjury that the foregoing is true and correct.


Signed this 26 day of January, 2004 at Las Vegas, Nevada.

Dywayne Richardson
Dyayne Richardson

*Law Offices of*
### KENNETH M. QUIGLEY
650 Fifth Street, Suite 502
San Francisco, California 94107
**(415) 546-7771**

June 19, 1993

Mr. Jesse C. Burleson
D-90284
P>O> Box 29 B1-110
Represa, CA  95671

CONFIDENTIAL
*Legal Mail*

Dear Mr. Burleson:

I have received your letter of 6/9/93 and want to answer it fully.  I also want to give you some advice: if you think that I have done something to represent you ineffectively, get a lawyer and pursue it through the courts.  As I have said many times, if I have actually done something to harm your case I will admit it.  My reputation will not be destroyed, since I am well known for doing a good job and defending my clients vigorously.  I will do whatever I can within the bounds of the law to help you out of this mess.  I was committed to doing that from the beginning and I still am committed to that.  You should know that fact already, since I did what I could on your habeas corpus proceedings for several years, including helping you communicate with attorneys whose job it was to attack me if they could, helping you get in contact with investigators, etc.

Obviously, you will not want me as your trial lawyer again should your case be reversed.  I understand and accept that, despite my desire to win what I think is a winnable case.  I wanted to win your case, and did the very best I could under the circumstances.

Let me answer some of your questions.  First, I would do some things differently if I had the opportunity to try the case over again.  First and foremost, I would put you on the stand.  Whether or not to take the stand is your choice, but of course I take an active role in advising you. I strongly suggested last time that you not take the stand, because I thought we had a better chance of winning the case that way.  You agreed, and did not take the stand on my advice.  With the benefit of hindsight, we now have re-examined that decision rather extensively.  That is understandable, but does not change the situation as it existed at the time.

9-28-87

0130

Jessie James Jackson
B/M    10-13-54
324 Haight    863-8193

I am Clarence Stevenson's nephew. Tonight
I was w/ him when the shooting occurred.
Just before the shooting he was talking
w/ four guys. My back was turned when
I heard shots. I turned and saw
Mark fall. I ran away at that time.
I had seen the four guys in the area
before. They were black and one of them
is "Jessie". He drives a black Cad,
Seville. A Gary was also there.
Jessie was one of those I saw walk away
from the shooting scene.



CENTRAL STATION
SEP 2 8 1987
2300 07O. 3731

STANISLLG BESON
NF 1-26-78
@ 1975 OCEANSOUTH
AVE OAKLAND
STUDENT AT
OLYMPUS TECH.
MELLWARDS (WIDOW)
ALCATRAZ AVE
BERKELEY
629-7665

In front of
7325 Type of
heard (large) men
& other System
talking about
shooting some
body

Remarks - heard
on shot - & ran
into 325 Type
ass than one
minute later fle
heard 3 shots
fle went outside
to see her in
front of 3738

**Frappier**
**Investigations**

P.O. Box 1160
Pacifica, California 94044
650.355.1321 TEL
650.355.3790 FAX
JfraPI@aol.com Email
License #15379

March 21, 2002

Jesse Clyde s/c Burleson
CDC# D-90284
Mule Creek State Prison
P.O. Box 409000
Ione, CA 95640

Re:    Habeas Petition Investigation

Dear Mr. Burleson:

The following is my report of investigation regarding the captioned matter pursuant to your instructions.

Officer Kevin Martin

On October 1, 2001, at approximately 9:15 PM, myself and attorney Diana Frappier met with and interviewed San Francisco Police Department Officer Kevin Martin at Southern Station, 850 Bryant Street. The purpose of the interview was to ask Officer Martin his recollection of a homicide investigation (Incident No. 871086952) in which he had been one of the responding officers. I also asked him to review the attached hand-written notes identified by the stamp "CENTRAL STATION SEP 28 1987".

After reviewing a copy of the attached notes, Officer Martin stated that the notes were his handwriting, although he had no specific recall of interviewing the witness Shanelle Brown identified in the notes. He said he had a vague recollection of someone being shot in the jaw. After reviewing the Incident Report. Officer Martin said that E.M. Kenney and Edward Erdelatz were the homicide detectives on the case, and that he (Martin) would have turned over his notes to the those detectives.

During the interview, Officer Martin excused himself to go call his partner during the 1987 investigation, Inspector Ray Ragona. Martin said that Ragona did not recall Shanelle Brown or the investigation. Martin said that he kept all his notes and he would check them to refresh his memory.

On October 30, 2001, I telephoned Officer Martin and asked if he had been able to review his notes. He said he had looked in his notes but could find nothing about this particular case. I asked if he would sign a declaration stating that the attached notes were his. He said he would have to decline unless he was ordered to so.

Exhibit A14

Habeas Petition Investigation
March 21, 2002
Page 2


<u>Inspector Ray Ragona</u>

I left two telephone messages for Inspector Ray Ragona but I never received a call back from him.

<u>Maggie Richards</u>

I interviewed Maggie Richards and enclosed is the original declaration she reviewed and signed.

I declare under the penalty of perjury and the laws of the State of California and the United States that all of the foregoing is true and correct

Executed on the 21st day of March 2002 in Pacifica, San Mateo County, California.

Jon Frappier

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA                              )

COUNTY OF _San Mateo_                            )

On _____3/2/02_____ before me, _Peter L. Balogh, Notary Public_

DATE                                    NAME, TITLE OF OFFICER – E.G. "JANE DOE, NOTARY PUBLIC"

personally appeared, _____Jon Frappier_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____(SEAL)
NOTARY PUBLIC SIGNATURE

```
PETER L. BALOGH
COMM. # 1234395
NOTARY PUBLIC-CALIFORNIA
SAN MATEO COUNTY
COMM. EXP. OCT. 8, 2003
```

_____ **OPTIONAL INFORMATION** _____

THIS OPTIONAL INFORMATION SECTION IS NOT REQUIRED BY LAW BUT MAY BE BENEFICIAL TO PERSONS RELYING ON THIS NOTARIZED DOCUMENT.

TITLE OR TYPE OF DOCUMENT _____Habeas Petition Investigation_____

DATE OF DOCUMENT _____3/21/02_____ NUMBER OF PAGES _____3_____

SIGNER(S) OTHER THAN NAMED ABOVE _____None_____

SIGNER'S NAME _____ SIGNER'S NAME _____

| RIGHT THUMBPRINT | RIGHT THUMBPRINT |
|---|---|
|  |  |

Exhibit A16

## DECLARATION OF MAGGIE RICHARDS

I, Maggie Richards, am a California licensed investigator (P.I. #9836) and owner/operator of Richards & Associates for the past nineteen years.

In 1987 I provided investigative services for Kenneth M. Quigley, Esq., Counsel for defendant Jesse Burleson regarding a 1987 San Francisco homicide. During that same time I provided investigative services to a number of other civil and criminal counselors.

This work was provided almost fifteen years ago and so my recollection is necessarily hazy respecting the specifics of the case. The file no longer exists as the matter was both adjudicated and appealed long ago. The file was retained for ten years, which is what limited space allows.

As recollection serves there were a number of individuals who were interviewed, either by the attorney, or by myself for the attorney, respecting this matter. The name Shanelle Brown is vaguely familiar. I do not believe I ever interviewed her. Had I been asked to do so, I would of course have so done.

I declare under penalty of perjury and the laws of the State of California that all of the foregoing is true and correct.

Executed on the 30th day of January 2002 in Daly City, San Mateo Co., California.

Maggie Richards

Excerpt of Record

Reporter's Transcript (RT)

**EXHIBIT** _____

MAY 26, 1988

THE COURT:  All right, the record should reflect the defendant is present, so are the attorneys, so are the jurors.

Ladies and gentlemen, we have reached that stage of the criminal proceedings where each side has the opportunity to address you in opening statements.

Like I have indicated yesterday, statements by attorneys is not evidence because the statement by each side is what they expect to prove.

Of course they are contesting each other as to what the state of the facts are.

And since their statements are not as a result of a stipulation or an agreement to the existence of any facts, anything they say in opening statements is evidence of nothing but it is used as an opportunity for them to tell you what they expect to prove.

You wait until you hear the evidence and determine what has been proved or not been proved.

All right, with that in mind, counsel, do you wish to make an opening statement?

MR. CUMMINS:  Yes, Your Honor, thank you.

*OPENING STATEMENT BY MR. CUMMINS:

Ladies and gentlemen, I am going to make a relatively short opening statement to you to outline the facts as I believe the evidence will be presented to you.

In this case where the charge is murder and attempted

murder and the defendant is accused as being the perpetrator of those crimes, this is what the evidence will show.

You all know it was on a Sunday night, September 27 of 1987. It was about 11:00 o'clock. It took place at 270 Turk Street in San Francisco which is Turk near Leavenworth, might be referred to as the capital of the Tenderloin district in San Francisco.

And on that particular night Popeye, Clarence ~~Jackson,~~ Stevenson was shot and killed. He was shot twice. The evidence will show he was shot by the defendant.

Mark Ellis who was also standing there in front of the Piedmont Hotel or Piedmont Apartments was shot by the defendant through the neck. It went up through the area, went right through his neck, missed the spinal column. He had to undergo surgery.

The bullet remained in his neck and back of his neck for many months and it was recently removed.

The evidence will also show that in a sense in the tragedy of this particular case that the defendant shot the wrong people, because the evidence will show that the (defendant thought they were two hitmen or two people from St. Louis who were out to get him, to kill him,) and the defendant was mistaken as to these two gentlemen)because Popeye Clarence ~~Jackson~~ Stevenson was a man in his fifties, he was unarmed as was Mark Ellis. They happened to be standing there in front of the hotel at that time.

The evidence will show that Clarence Stephenson was a drug addict, perhaps a small time drug salesman and as I

1         THE COURT: All right, the record should reflect the

2    defendant is present, so are the attorneys, so is the jury.

3         Next witness?

4         MR. CUMMINS: Yes, Your Honor.

5         THE CLERK: Please take the stand.

6         (WHEREUPON* MARK ELLIS was called as a witness by the

7    People, was duly sworne and testified as follows:)

8         THE WITNESS: I do.

9         THE CLERK: Please state your name for the record.

10        THE WITNESS: My name is Mark Ellis.

11        THE CLERK: Last name?

12        THE WITNESS: Ellis.

13        THE CLERK: E-L-L-I-S?

14        THE WITNESS: Yes.

15        THE CLERK: Thank you, please be seated.

16               *Direct-Examination

17        MR. CUMMINS: Q. Sir, your name is Mark Ellis, is

18   that correct?

19       A.  Yes.

20       Q.  How old are you?

21       A.  29.

22       Q.  In the past you have been convicted of grand

23   theft, is that correct?

24       A.  Yes.

25       Q.  And have you been convicted of attempted robbery?

26       A.  Yes.

27       Q.  Have you been arrested in the last two years?

28       A.  No.

1     Q.   And yourself?

2     A.   And myself.

3     Q.   Did you go into the apartments?

4     A.   No, I waited outside.

5     Q.   You said Popeye.  Who is Popeye?

6     A.   Well, so far as I know--I don't know but the name

7  is supposed to be Clarence Stephenson.

8     Q.   I am going to show you a photograph which is

9  People's 1 for--in evidence.

10        Do you recognize that man?

11     A.   Yes, that is Popeye.

12     Q.   When you went to the--you went to the Piedmont

13  Apartments of the Piedmont Hotel, is that correct?

14     A.   Yes.

15     Q.   All right, who went inside?

16     A.   Johnny Reed.

17     Q.   Who was outside then?

18     A.   Me and Popeye and about six other people.

19     Q.   Where are the six other people?

20     A.   They was all standing in front of the Piedmont.

21     Q.   Had you had anything to drink that night?

22     A.   No.

23     Q.   Had you injected anything, smoked anything?

24     A.   No.

25     Q.   Did you have any weapons on you?

26     A.   No.

27     Q.   Had you ever seen--let me back up.

28        Do you see anyone in the courtroom today that you

1    recognize?

2          A.    Yes.

3          Q.    And where is that person seated?

4          A.    To the right.

5          Q.    And you pointed a certain direction.  Would you

6    please indicate what that person is wearing in court today?

7          A.    White shirt, tan slacks, brown tie, glasses.

8          MR. CUMMINS:  May the record reflect that the witness

9    has pointed to and identified the defendant, Your Honor?

10          THE COURT:  Yes, the record will so reflect.

11          MR. CUMMINS:  Q.    Did you have any grudge against the

12    defendant on this night or before this night of September 27,

13    1987?

14          A.    No, I never had a grudge against him, never knew

15    him, never said nothing, never ever had a beef against him at

16    all.

17          Q.    You never had a beef against him at all.

18          How many times had you seen him, the defendant, before

19    this occasion?

20          A.    About three times because, you know, I was

21    walking around the Tenderloin.

22          Q.    Had you ever spoken to him before?

23          A.    No.

24          Q.    Did you speak to him on this evening before the

25    actual incident took place?

26          A.    No.

27          Q.    Did he speak to you?

28          A.    No.

148

1    Q. What were you doing and why were you outside of

2 the Piedmont Apartments at that time?

3    A. Well, John went to get some outfits.

4    Q. And what do you mean by outfits?

5    A. Syringe.

6    Q. Hypodermic needles, is that the idea?

7    A. Yes.

8    Q. Were any of those to be for you?

9    A. No, I don't use.

10    Q. Where were you going to go after that?

11    A. To the apartment.

12    Q. Where were you personally going to go?

13    A. Personally I was going to go back to the

14 apartment.

15    Q. Why?

16    A. Because I went to get the drink.  We were going

17 to party.  John couldn't get in the apartment because the

18 doorbell don't work, that is why I was waiting for him in

19 front of the Piedmont.

20    Q. Where were you waiting in front of the Piedmont

21 Apartments?  Were you directly in front?  To the side?

22    A. Directly in front of the Piedmont.

23    Q. How was your body in connection with like the

24 front door?  Were you looking away from it?  Looking towards

25 it?

26    A. Well, I was looking in front of it and I glanced

27 to my left and that is when Jesse was standing a building

28 over but I didn't really have nothing on my mind because I

1    didn't--I ain't had no beefs against him so I don't--

2         Q.   Where were you on the sidewalk, if you were on

3    the sidewalk in connection with the front of the hotel?

4         Were you up against anything or where were you?

5         A.   I was sitting on the car.

6         Q.   What part of a car?

7         A.   The front of it.

8         Q.   And were you looking towards the hotel or away

9    from the hotel just before you saw Jesse?

10        A.   Just before I saw him I was looking in front of

11   the hotel.

12        Q.   And where the car was parked were you--and you

13   were sitting on it, was your body faced toward the hotel?

14        A.   Faced toward the hotel.

15        Q.   At some time then after you were on the car, you

16   saw the defendant, is that correct?

17        A.   Yes.

18        Q.   And in what direction was the defendant from you?

19        A.   Toward the left.

20        Q.   And would that be toward what street?

21        A.   Toward Leavenworth.

22        Q.   When you first saw the defendant how far away was

23   the defendant from you, approximately?

24        A.   About thirteen feet--twelve, thirteen feet.

25        Q.   And what did you see the defendant doing when you

26   first saw him?  If anything?

27        A.   Nothing at the time, just looking.

28        Q.   What happened next?

1        A.   Well, next time I was standing I started seeing

2  walking toward--

3        Q.   You started seeing what?

4        A.   The time I was standing in front of the Piedmont

5  he was just looking but as time passed by I started seeing

6  him walk toward me or Popeye, I don't know which one, but he

7  was walking toward where I was sitting.

8        Q.   Was anyone else moving towards where you were

9  sitting at that time?

10       Was anyone else moving at that time when you saw the

11  defendant moving towards your direction?

12       A.   No, just at that time.

13       Q.   What happened next?

14       A.   Next I looked to my right down the street and the

15  next thing noise, I was hit, but I seen somebody coming past

16  me after I got hit.

17       Q.   Who was that?

18       A.   Jesse.

19       Q.   The defendant?

20       A.   Yes.

21       Q.   You are sure about that?

22       A.   I am sure.

23       Q.   What happened after he was coming past you?

24       A.   I thought it was a firecracker or something, it

25  was like a shock.  I was in shock for a minute.

26       Q.   What happened then?

27       A.   Then I realized I was hit but I didn't fall right

28  then and there.

1    Q.    How long had you been waiting in front of the

2    Piedmont before you got shot?

3    A.    I was sitting in front of the Piedmont about five

4    minutes.

5    Q.    Were you with Johnny Reed when Popeye approached

6    him for syringes?

7    A.    Yes, I was with him.

8    Q.    Was Johnny Reed to get anything for these

9    syringes?

10    A.    I can't answer that, I don't even know.  I was

11    just waiting for him but, you know, I heard him saying

12    "Outfit".  I don't know what he is getting for it or nothing

13    like that.

14    Q.    Don't--for example if he was to get money or

15    narcotics for those syringes?

16    A.    I can't say.  I was just waiting for him.  He has

17    told me to wait outside.

18    Q.    Are you talking about before you were waiting

19    outside?  I am talking about when you were with Johnny Reed

20    getting that liquor and Popeye approached you, right?

21    A.    He approached John.

22    Q.    And you were with Johnny?

23    A.    I was with him.

24    Q.    And you heard Popeye ask?

25    A.    I heard him ask.

26    Q.    And what did Johnny answer?

27    A.    He say wait, let me go in the building.  Let me

28    go to my room.  I got a few upstairs.

1    Q.    Where did that happen, the conversation where

2    Popeye asked?

3    A.    Well, I came out the store and I was on my

4    direction to go back toward Hyde, but he say Johnny come out

5    with me.  He stopped and there is a bus stop sits right there

6    on Leavenworth and Turk stopping there so I walking

7    with--walking with him toward the Piedmont.

8    Q.    So Popeye wanted some syringes for--from Johnny

9    Reed?

10    A.    Yes.

11    Q.    And you decided just to tag along?

12    A.    No, I didn't decide--he could get back in the

13    building, the doorbell didn't work and wasn't no way we was

14    going to know if he was standing out there or not so I told

15    him Well, I will wait, you know.  I said I hope it don't take

16    long but I will wait for him.

17    Q.    You said you don't know Mr. Burleson?

18    A.    No, I don't know him personally.

19    Q.    You don't know any reason why he would want to

20    shoot you?

21    A.    For mistaken, mistaken me for somebody else.

22    Q.    Are you familiar with the neighborhood at Turk

23    and Leavenworth?

24    A.    I be hanging there since 1976 so I am familiar

25    with it.

26    Q.    That is twelve years you have been hanging in

27    that neighborhood?

28    A.    Yes.

2

1      end of the cross section and stand between a

2      pickup -- blue pickup truck and another vehicle, a

3      car in front.

4             Q.    And what did he do?

5             A.    He raised and extended his arm and

6      fired a shot in the direction of the man that had

7      ran away -- across in front of me.

8             Q.    What happened next?

9             A.    Mr. Hartman and myself immediately went

10     inside my building out of fear.

11            Q.    This man who raised and extended his

12     arm, did he do anything before you went into the

13     building?  Did you hear anything?

14            A.    He fired a shot in the direction of the

15     person who had crossed in front of me and ran

16     diagonally across Leavenworth Street toward Market.

17     He was going up in that direction toward Market

18     Street.

19            Q.    Did you see --

20            MR. QUIGLEY:  I'm sorry, Mr. Cummins.

21            Excuse me, Mr. Riggs.  I just didn't

22     hear that last answer.  You were saying that the

23     person who did the shooting went up Leavenworth

24     Street?

25            THE WITNESS:  No.  The person who was

26     running.

27            MR. QUIGLEY:  All right.  Sorry.

28            MR. CUMMINS:  Q.  Did you see what

1      A.      Yes, it is.

2      Q.      And what can you say about the person

3      that's shown in that photograph in reference to

4      that person being the shooter?

5      A.      As I said in my statement to Inspector

6      Erdelatz, he out of all the others was the one that

7      most resembled that person that fired the shot in

8      the direction of the person running across in front

9      of me.

10     Q.      Do you see the person in court today

11     whom that is a picture of?

12     A.      I believe that is the gentleman sitting

13     over here on the right (indicating).

14     Q.      And what is he wearing today in court?

15     A.      White shirt, tie and glasses.

16     Q.      Now, what can you under oath tell the

17     ladies and gentlemen of the jury about whether or

18     not he is the person who was firing that gun in

19     reference to the questions I've been asking you?

20     A.      He best resembles the person that fired

21     the shot that night.  That's all I can say.

22     Q.      He best resembles of the six, do you

23     mean?

24     A.      Of the six -- Of this person's

25     photograph in front of me is the same person.

26          MR. CUMMINS:  May I ask the defendant

27     to stand, Your Honor?

28          THE COURT:  All right.

1      Q.    So today in court after Mr. Quigley

2   showed you two other photographs and then showed

3   you the photograph which is People's 1 for purposes

4   of identification, are you able to say positively

5   that this person who is the deceased in this

6   case -- is that correct?

7      A.    Absolutely.

8      Q.    -- is the man who ran across the

9   street in front of you?

10     A.    Yes.

11         MR. CUMMINS:  Nothing further.

12         THE COURT:  Thank you.  Next witness.

13         MR. CUMMINS:  Yes, Your Honor.  The

14   People would call Bencel Bautista.

15

16              BENCEL BAUTISTA,

17   called as a witness on behalf of the People, having

18   been first duly sworn, testified as follows:

19

20         THE  WITNESS:    Bencel  Bautista,

21   B-e-n-c-e-l, last name B-a-u-t-i-s-t-a.

22         THE COURT:  You may proceed.

23

24              DIRECT EXAMINATION

25

26   BY MR. CUMMINS:

27     Q.    Do you see Jesse Burleson sitting in

28   the courtroom?

1        Q.    Where did you see the defendant?

2        A.    In the Ternderloin.

3        Q.    And where in the Tenderloin did you see

4  him, if you recall.

5        A.    Turk and Leavenworth.

6        Q.    Who were you with, if anyone, when you

7  saw the defendant?

8        A.    I was with my girlfriend, Antonique

9  Shelton.

10       Q.    Were you on foot or in a car?

11       A.   We was in my car.

12       Q.    And how did you happen to come in

13  contact with the defendant?  Was it just by chance

14  or was it prearranged that you'd see each other?

15       A.    It just happened.  We just happened to

16  go through.

17       Q.    So what happened when you saw the

18  defendant?

19       A.    We just chatted.

20       Q.    And what did you talk about?

21       A.    Oh, we just said, "What's up," and he

22  said that some St. Louis guys was after him and

23  they had a contract.

24       Q.    What does that mean, "they had a

25  contract"?

26       A.    I don't know.  I wasn't quite sure at

27  the time.

28       Q.    How did the defendant appear when he

said that?

          MR. QUIGLEY:  Objection.  Vague.

          MR. CUMMINS:  All right.

Q.   Would you characterize -- Was he happy, sad, tearful, frightened?

A.   He -- like worried.

Q.   He said some guys from St. Louis were looking for him?

A.   Yes.

Q.   Did he say what the guys from St. Louis were going to do to him, if anything?

A.   No.

Q.   But he did say that the guys from St. Louis had a contract on him?

A.   Yes.

Q.   Did he say what that was in reference to, why some people from St. Louis would have a contract on him?

A.   No.

Q.   Do you know, sir, what that phrase means, "having a contract"?  Do you have any idea what that means?

A.   I wasn't quite sure at the time.

Q.   Do you have an idea of what it means now?

A.   Yes.

Q.   And what does it mean --

A.   It means --

Q.      -- as you understand it?

A.      What do it mean?   It means kill a person.

Q.      Did you ask the defendant why anyone was out to kill him?

A.      No.

Q.      Did the defendant say anything else?

A.      No.

Q.      Did the defendant -- Well, what else did the defendant say?

A.      That was about it.

Q.      Do you recall anything else he said to you at that time?

A.      No

Q.      Do you recall if he said to you that he wanted you to join him?

A.      No.

Q.      Was it your girlfriend's sister's birthday that night?

A.      Yes.

Q.      And after you talked to the defendant, did you go somewhere for your girlfriend's sister's birthday?

A.      Yes.

Q.      Do you remember talking to San Francisco Police Department inspectors, either Inspector Kenney or Inspector Erdelatz, on October 5th, 1987?

A.    Yes.

Q.    And did you give them a statement at that time?

A.    Yes.

Q.    Did you tell either Inspector Ed Kenney or Inspector Ed Erdelatz that the defendant told you that he wanted you to join him but you couldn't because it was your girlfriend's sister's birthday?

A.    (No response)

Q.    Do you remember saying that to the Inspector?

A.    I told him I was going out to my sister-in-law's birthday.

Q.    I understand that.

Your Honor, I have a one-page document that's been marked as People's 9 for purposes of identification.

THE COURT:  All right.

MR. CUMMINS:  Q.  I'm just going to show you this, Mr. Bautista, and could you please take a look at it and see if you recognize it. Just let me know when you've finished reading that.

You've read that, sir?

A.    Yes.

Q.    All right.  Do you see the part in there where the sentence begins, "He asked me to join him, but it was my girlfriend's sister's birthday"?

1    that point Johnnie Reed identified Mr. Burleson.

2                    THE COURT:   Mr. Cummins, do you accept

3    that stipulation?

4                    MR. CUMMINS:  Yes, Your Honor.

5                    THE  COURT:   All  right.   Ladies  and

6    Gentlemen, at that point of the questioning process

7    in Municipal Court, then Johnnie Reed on that date

8    before  the  judge  while  under  oath  on  the  stand,

9    pointed and identified the defendant, Mr. Burleson,

10   in the Municipal Court.

11                   All right.  Go on.

12                   MR.  CUMMINS:   Going  to  line  13,  Your

13   Honor, on the next page.

14                   MR.  CUMMINS:   "QUESTION:

15                   H o w   c l o s e   w a s   t h e

16                   defendant,  Mr.  Burleson,

17                   Jesse,  as  you  referred  to

18                   him, to Mark when you first

19                   saw him?"

20                   THE  WITNESS:   "ANSWER:

21                   About like that, I guess.

22                   MR.  CUMMINS:   "Indicating

23                   with  his  hands  approxi-

24                   ately  two,  two-and-a-half,

25                   three feet."

26                   MR.  CUMMINS:   "QUESTION:

27                   Could you do that again for

28                   His Honor to see?"

1           THE   WITNESS:    "ANSWER:

2           (Witness complies)"

3           MR. QUIGLEY:  My response was, "I

4           would say a foot-and-a-half."

5           THE COURT:  And the Court said, "Okay."

6           Go on.

7           MR. CUMMINS:    "QUESTION:

8           What  did  you  first  see

9           between the two?  Did you

10          understand  the  question?

11          Did  you  see  anything

12          happening between the two

13          of them when you first saw

14          them, that is Mark and the

15          defendant?"

16          THE WITNESS:  "ANSWER:  Not

17          at first."

18          MR. CUMMINS:    "QUESTION:

19          Did  you  eventually  see

20          something  about  the

21          defendant  that  attracted

22          your attention?"

23          THE WITNESS:  "ANSWER:  He

24          had a gun in his hand."

25          MR. CUMMINS:    "QUESTION:

26          What kind of gun was it?"

27          THE WITNESS:  "ANSWER:  I

28          don't  know  what  kind  of

1    weren't more than three feet on the other side of

2    the window.

3        Q.    Did you see anything happen amongst

4    these two men and the woman?

5        A.    The man and the woman came off of Turk

6    around the corner onto Leavenworth.  They were on

7    the sidewalk at that point.  There were cars parked

8    on the corner.  They came in front of the first car

9    between two cars and the gentleman came -- the

10   other gentleman came not on the sidewalk but from

11   the street crossing Turk and joined them.

12       They passed a gun -- The gentleman that

13   joined them passed a gun to the girl and she placed

14   it in a bag that she was carrying at the point

15   where they joined together and then they came

16   across the street right in front of the hotel and

17   continued up the street.

18       Q.    Do you know much about guns, the

19   difference between, for instance, a revolver and an

20   automatic?

21       A.    I don't know a whole lot about guns.  I

22   know that a revolver is a little bit bigger, but I

23   don't know a whole lot about them, no.

24       Q.    What happened to the gun when it was

25   being passed?  You said it went from one male to

26   the female; is that correct?

27       A.    Yes.

28       Q.    Was anything done with the gun?

1      THE WITNESS:  Thank you.

2      THE COURT:  Next witness.

3      MR. CUMMINS:  Yes.  Your Honor, we have

4  two witnesses up in the Homicide Detail right now.

5  I was wondering if you wanted to take your morning

6  break.  Otherwise, we can make a quick phone call.

7      THE COURT:  All right.  We're going to

8  take a ten-minute recess.  Don't discuss the case

9  or form any opinions.

10      You'll have the witnesses here in ten

11  minutes, one after another; right?

12      MR. CUMMINS:  Oh, yes, Your Honor.

13      (Recess taken)

14      THE COURT:  All right.  Let the record

15  reflect the defendant is present.  So are the

16  attorneys.  So is the jury.  Next witness.

17      MR. CUMMINS:  Yes, Your Honor.  The

18  people would call Jessie James Jackson.  We'd ask

19  that he step forward and be sworn.

20

21      JESSIE JAMES JACKSON,

22  called as a witness on behalf of the People, having

23  been first duly sworn, testified as follows:

24

25      THE WITNESS:  Jessie James Jackson.

26  ///

27  ///

28  ///

1        <u>DIRECT EXAMINATION</u>

2

3    BY MR. CUMMINS:

4        Q.    Directing your attention to September

5    27, 1987, was that the night that your godfather

6    was killed?

7        A.    Yes, it was.

8        Q.    And what is his name?

9        A.    Clarence Stevenson.

10        Q.    I'm going to show you People's Exhibit

11    1 in evidence, I believe, briefly.

12            Is that a picture of your uncle --

13        A.    Yes, it is.

14        Q.     -- or your godfather?

15            Were you on Turk Street near to or in

16    front of the Hurley Apartments  -- excuse me  --

17    near to the place of the scene of the shooting, the

18    Piedmont Apartments?

19        A.    Yes.

20        Q.    And at around 11 o'clock, can you tell

21    us approximately where you were standing in

22    relation to the Piedmont Apartments on Turk Street?

23        A.    I was standing about 15 feet away from

24    the front door of the Piedmont.

25        Q.    Were you standing with anyone else?

26    Was anyone right next to you or close nearby?

27        A.    Yeah.   I was standing in a crowd of

28    four people:   Clarence Stevenson and Mark and Gary.

1    I moved --

2           Q.    Do you know Mark's last name?

3           A.    No, I don't.

4           Q.    Do you know Gary's last name?

5           A.    No.

6           Q.    Is he dead now?

7           A.    Yes, he is.

8           Q.    And at approximately 11 o'clock on that

9    night, what occurred?

10          A.    Well, I stepped away from the crowd

11   because there was a crowd of people standing there

12   and I stepped away from the crowd.  I seen Jesse

13   come out the door (indicating).

14          Q.    When you say, "Jesse," you pointed in a

15   certain direction.  Would you tell us what Jesse is

16   wearing today, please?

17          A.    He's wearing a white shirt and a green

18   tie.

19          MR.  CUMMINS:    And  may  the  record

20   reflect  that  the  witness  has  referred  to  and

21   identified the defendant, Your Honor?

22          THE COURT:  Yes.

23          MR.  QUIGLEY:    May the record reflect

24   the defendant is wearing a brown tie as identified

25   by Ms. NIcholson?

26          THE COURT:  All right.  He's wearing a

27   white shirt and a tie.

28          MR.  CUMMINS:    Q.    Did  you  know  the

1      defendant before September 27, 1987?

2          A.    Yes.

3          Q.    How long had you known him before that

4      time?  Like months, days, years?

5          A.    Oh, off and on, I've been seeing him

6      around the Tenderloin about a year.

7          Q.    Up until that time at 11 o'clock, did

8      you have anything against the defendant?

9          A.    No, I didn't.

10         Q.    And after you first saw the defendant,

11     what happened?

12         A.    (No response)

13         Q.    Let me rephrase that.

14             You say you saw him coming out of the

15     hotel or from the entrance way of the hotel?

16         A.    I seen him come out of the Piedmont

17     Apartments.  When he came out of the Piedmont

18     Apartments, he had a gun and he said, "You mother-

19     fucker," bam! and shot Mark.  After the bullets

20     went off, I ran towards -- down Turk Street towards

21     Jones.  I heard some more shots.  I come back up

22     the street and Gary told me that Clarence --

23         Q.    Don't tell me what Gary told you.

24             Did you see Popeye -- Did you see

25     Clarence Stevenson being shot?

26         A.    No, I didn't.

27         Q.    You just heard something to that

28     effect?

1    A.  Yes, it is.

2    Q.  And during that time that I spoke to

3 you, Inspector Kenney was with me; is that correct?

4    A.  Yes.

5    Q.  You indicated that to us this morning

6 at about -- somewhere before court started, before

7 9:30 or something; is that correct?

8    A.  Yes.

9    Q.  You're in custody now; is that right?

10    A.  Yes, I am.

11    Q.  Now, have you been promised anything by

12 the inspectors in this particular case in terms of

13 a reduced sentence or anything in order to testify

14 in this matter?

15    A.  No, I haven't.  I've already been

16 sentenced.

17    Q.  Pardon?

18    A.  I have already been sentenced.

19    Q.  Have you been promised anything by

20 myself or any member of the District Attorney's

21 office in terms of if you testify and how you

22 testify in this particular matter?

23    A.  No.

24    Q.  Has anyone from the defense  -- that

25 is, Mr. Quigley, the defense attorney who is to

26 my -- the second gentleman to my left, or any of

27 his investigators, been up to talk to you or speak

28 to you regarding your testimony in this particular

1    case?

2          A.    No.

3          Q.    Are you sure it was the defendant who

4    had the gun and it was the defendant who shot Mark?

5          A.    Yes, I am.

6          MR. CUMMINS:  No further questions.

7

8                   CROSS-EXAMINATION

9

10    BY MR. QUIGLEY:

11          Q.    You gave the police a false address

12    that night, the night you gave the statement?

13          A.    No, I didn't.

14          Q.    Your home is 342 Haight Street?

15          A.    I was staying with Clarence Stevenson

16    and his wife and his son.

17          Q.    So you weren't registered there at

18    324 Haight Street?

19          A.    Pardon me?

20          Q.    You weren't registered there at

21    324 Haight Street?

22          MR. CUMMINS:  Registered as --

23          MR. QUIGLEY:  Q.  I mean that wasn't

24    your apartment, was it?

25          A.    No, it wasn't.  It was his apartment.

26          Q.    But the people who stayed there, they

27    knew you --

28          A.    Of course.

1    and this morning did you ever come forward and tell

2    anybody about the shooting?

3            A.     I believe I was incarcerated, sir.

4            Q.     You're incarcerated.    Where have you

5    been incarcerated?

6            A.     Here, CDC.

7            Q.     The Department of Corrections?

8            A.     Yes.

9            Q.     State Prison?

10           A.     Yes.

11           Q.     You've been convicted of how many

12   felonies?

13                  MR. CUMMINS:   Whoops.   Objection.

14                  MR. QUIGLEY:   Q.   How many felonies --

15                  MR. CUMMINS:   Excuse me.   Objection.

16                  THE COURT:   Do you want to approach the

17   bench?

18                  (Bench conference)

19                  MR. QUIGLEY:    Q.    While you were

20   incarcerated, sir, you're in the constant company

21   of sheriffs while you're in this building?

22           A.     Yeah, when I'm here.

23           Q.     Pardon me?

24           A.     When I'm here.

25           Q.     How long were you here?

26           A.     When?    What specific time are you

27   talking about?

28           Q.     How many days, weeks or months have you

1    been imprisoned here in this building since the

2    date of the shooting between then and now?

3         A.    I guess about -- almost a year.

4         Q.    And in all that time, you're never

5    really out of the earshot of a deputy sheriff, are

6    you?

7         A.    Pardon me?

8         Q.    If you ever called out, a deputy would

9    hear?

10        A.    Called out?

11        Q.    Yes.

12        A.    Sure.

13        Q.    Pardon me?

14        A.    Sure.

15        Q.    So any time you wanted, you could have

16   informed a sworn deputy sheriff about this

17   shooting, correct?

18        A.    No.

19        Q.    You couldn't?  There was something that

20   refrained you -- something that stopped you from

21   telling a sheriff or a policeman about this

22   shooting?

23        A.    Yes.

24        Q.    What was that?

25        A.    I don't -- You know, I don't talk to

26   the sheriffs.

27        Q.    But you talked to police inspectors

28   this morning; right?

1       A.      Briefly.

2       Q.      And you talked to them briefly on

3   September 28th, 1987 a couple of hours after the

4   shooting happened?

5       A.      Yes, I did.

6       Q.      And did you tell them at that point who

7   had done the shooting?

8       A.      Yes, I did.

9       Q.      And you told them it was Mr. Burleson?

10       A.      I believe I did.

11       Q.      Where did Mr. Burleson come from just

12   before the shooting?

13       A.      Out of the front door of the Piedmont.

14       Q.      Do you know where he went after the

15   shooting?

16       A.      No, I don't.

17       Q.      Where did you go?

18       A.      I went to Turk and Jones.

19       Q.      All right.  Showing you what's been

20   marked as Exhibit 5, would it be accurate to say

21   you ran down the sidewalk on the north side of Turk

22   Street in an easterly direction towards Jones

23   Street?

24       A.      What side is the Piedmont on?

25       Q.      This is the Piedmont Apartments right

26   here (indicating).

27       A.      That's the side I ran down.

28       Q.      Where did you go when you got to Jones

1   TUESDAY, MAY 31, 1988                AFTERNOON SESSION

2

3                    P R O C E E D I N G S

4

5              THE COURT:  All right.  Let the record

6   reflect the defendant is present.  So are the

7   attorneys.  So is the jury.  Next witness.

8              MR. CUMMINS:  Yes, Your Honor.  He's

9   just outside the courtroom.

10

11                   DON CARLOS RHODES,

12   called as a witness on behalf of the People, having

13   been first duly sworn, testified as follows:

14

15              THE WITNESS:  Don Rhodes, R-h-o-d-e-s.

16

17                   DIRECT EXAMINATION

18

19   BY MR. CUMMINS:

20        Q.    Sir, will you tell us your name again,

21   please?

22        A.    It's Don Rhodes, R-h-o-d-e-s.

23        Q.    And presently you're in jail somewhere;

24   is that correct?

25        A.    Yes, I am.

26        Q.    Where is that?

27        A.    Santa Clara County.

28        Q.    And what are you doing time on?

1    say?

2        A.    Yes.

3        Q.    Would it change your opinion at all if

4    I told you Mr. Burleson has never had a step-

5    father?

6        A.    No, sir.

7        Q.    Are you sure he said that?

8        A.    Yes, sir.

9        Q.    Did Mr. Burleson admit any other crimes

10   besides this shooting?

11       A.    No, sir.

12       Q.    What was Raymond in there for?

13       A.    I believe it was tickets.   I'm not

14   sure.   I wasn't too -- familiar with too many

15   people in that jail.

16       Q.    But you heard the conversation

17   between --

18       A.    Yes.

19       Q.     -- Raymond and Mr. Burleson?

20       A.    Yes.

21       Q.    You heard the whole conversation?

22       A.    Yes, sir.

23       Q.    And they were asking each other what

24   they were in for?

25       A.    Yes, sir.

26       Q.    And what was Raymond in for?

27       A.    I don't recollect, I don't remember.

28       Q.    So you just remember one side of the

conversation?

    A.    Yes.

    Q.    The one you told the police about?

    A.    Yes, sir.

    Q.    You just can't remember the other side?

    A.    No, sir.

    Q.    And you said -- and I'm going to quote again -- "He said because they was supposed to have been out to try -- you know, to try to off him because they were jealous of him and all this other stuff." Is that what you said?

    A.    Yes.

    Q.    "They were supposed to have been out to try to off him," that means that that's what somebody else is saying about him; right?

    A.    That means like when somebody is trying to put a hit on somebody, like when somebody is trying to kill somebody.

    Q.    That's a contract you're talking about; right?

    A.    Yes, sir.

    Q.    Now, when you say, "They were supposed to have been," that indicates that someone else is saying this? If I were to say, "That man was supposed to have said this about me," I'm not saying he did say that. It was something he was supposed to have said; right?

    A.    No. Like -- For instance, like if I'm

talking to somebody and I say, "Yeah, they had a contract on me," they was going to try to kill me, but it's a country way of speaking, you know, because of my slang, the way I talk.

Q.   I'm sorry.   What's a country way of speaking?

A.   You know, I say, "supposed."

Q.   Where are you from, sir?

A.   Well, I'm originally -- I was born in 'Frisco and raised in Richmond, Virginia, and Palo Alto.

Q.   Didn't you tell the police you were from South Lake Tahoe?

A.   Yeah.   That's where I'm on parole from.

Q.   Have you ever been convicted of a felony?

A.   Yes.

Q.   Besides the felony battery you're in Santa Clara for?

A.   Yes.

Q.   What's that?

A.   It was a felony.   I'm not forced to answer it.   Is it important?

MR. QUIGLEY:   Your Honor, may the witness be instructed to answer my question?

MR. CUMMINS:   Well, I'd ask for a quick Castro hearing, Your Honor.

THE COURT:   All right.   Sidebar or in

1                        MAGGIE RICHARDS,

2      called as a witness on behalf of the defense, having

3      been first duly sworn, testified as follows:

4

5              THE    WITNESS:    My    name    is    Maggie

6      Richards, M-a-g-g-i-e. R-i-c-h-a-r-d-s.

7

8                      DIRECT EXAMINATION

9

10     BY MR. QUIGLEY:

11         Q.    Ms. Richards, what is your occupation?

12         A.    I'm a private investigator.

13         Q.    Did you work on this case for me?

14         A.    I did.

15         Q.    In the course of working on this case,

16     did  you  have  occasion  to  speak  with  Eileen

17     Nicholson?

18         A.    I did.

19         Q.    And  did  Ms.  Nicholson  describe  the

20     transfer of a gun from one person to another on

21     Leavenworth Street that occurred on September 27,

22     1987?

23         A.    Yes.

24         Q.    Did she give you a physical description

25     of the man who gave the gun to the other person?

26         A.    Yes.  She described that individual as

27     being about 5'9", wearing dark clothes, with a dark

28     jacket with denims -- blue denims and with a black

1      MR. CUMMINS:  No questions.

2      MR. QUIGLEY:  Excuse me.  I do have.

3      Q.    Did you attempt to locate a Jessie

4  James Jackson?

5      A.    Yes, I did.

6      Q.    Using information provided you through

7  discovery of police reports in this case?

8      A.    Yes.

9      Q.    Did you go to the address he gave the

10  police?

11      A.    Yes.

12      Q.    Were you able to locate him there?

13      A.    No.

14      Q.    Did you call the telephone number he

15  gave to the police?

16      A.    Yes, the telephone number associated

17  with the address.

18      Q.    Did someone answer?

19      A.    Yes.  A woman answered.

20      Q.    Had they ever heard of Jessie Jackson?

21      A.    No.  Denied knowing him.

22      MR. QUIGLEY:  Thank you.  No further

23  questions.

24

25                  CROSS-EXAMINATION

26

27  BY MR. CUMMINS:

28      Q.    Were you with the Sheriff's Department

for eight years?

A.    Yes.

Q.    Did you ever think as a former Sheriff's Department investigator, someone who is now a private investigator -- did you ever think of calling the California Department of Corrections to locate Mr. Jackson?

A.    Not at that time.

Q.    Doesn't the Sheriff's Department -- Isn't it responsible for bringing prisoners from State Prison to the City and County of San Francisco if they're going to testify in certain cases?

A.    Actually, my function as a private investigator is to do what I'm asked to do by the attorney for whom I'm working.

Q.    Did you hear my question?

A.    I did.

Q.    Isn't the San Francisco Sheriff's Department responsible for bringing prisoners who are witnesses from State Prison to San Francisco to court to testify?

A.    Yes.

Q.    And did you yourself ever ask the homicide inspectors where Jessie James Jackson was?

A.    No, I did not.

Q.    And you've been to the homicide detail, haven't you, to pick up photographs that were

601

Q. Can you buy anywhere .25 caliber ammunition that could be fired out of any revolver?

A. No.

MR. QUIGLEY: No further questions.

MR. CUMMINS: No questions.

THE COURT: Thank you.

MR. QUIGLEY: Call Inspector Kenney.

(WHEREUPON *EDWIN KENNEY, having been previously sworne, resumed the stand and testified as follows:)

THE CLERK: Mr. Kenney, you have been previously sworne and you are still under oath.

Please restate your name for the record.

THE WITNESS: Edwin Kenney, K-E-N-N-E-Y.

MR. QUIGLEY: Thank you.

*Direct-Examination

MR. QUIGLEY: Q. Inspector Kenney, you and your partner Inspector Erdelatz are the homicide officers on this case?

A. Yes, sir.

Q. And you have been since the beginning?

A. Yes.

Q. Any other members of the homicide detail who are responsible for this case?

A. No.

Q. At some point, Inspector, did you order a tape recording from the Police Communications Department relative to this case?

A. I did on two occasions.

1    A.    Well, the primary reason is this occurred

2    approximately a week later and also people had moved from one

3    place to another in jail or out of jail and also it has been

4    my experience that upon attempting to interview people in

5    custody, especially in relation to asking them questions as

6    to the activities of another inmate that they are reluctant

7    to give forth any information.  Nobody wants what they call a

8    snitch jacket.

9        Q.    Inspector, did you speak to the two young people

10   who testified in this case, one was Antonique Shelton.  Did

11   you interview her?

12       A.    Yes, I did.

13       Q.    Were you also present at the time that Bencel

14   Bautista was interviewed?

15       A.    Yes, I was.

16       Q.    Where were they interviewed, Inspector?

17       A.    In front of Bencel's house in a plain clothes

18   police vehicle.

19       Q.    And I am going to show you what has been marked

20   as People's 11 for purposes of identification.

21       Would you take a look at that, please?

22       Do you recognize what that is, Inspector?

23       A.    Yes, I do.

24       Q.    When was this statement taken from Antonique

25   Shelton?

26       A.    On the 5th of October at about 7:00 o'clock in

27   the evening.

28       Q.    Okay, did you speak to Bencel or Antonique first?

A.   We spoke to Antonique first and took a statement from her and then we spoke to Bencel.

Q.   All right.

Did you ask Antonique at that time when you were interviewing her what, if anything, the defendant said. What the defendant said to her and Bencel earlier in the evening on the night of the shooting?

A.   Yes, I did.

Q.   What was her response?

A.   She told me that the defendant got into their car and said that there were some niggers from St. Louis trying to kill him.

Q.   Anything else?

A.   She also told me that she didn't know who they were but one of them just had gotten out of the pen and that the defendant, Jesse, was looking for some help and wanted Ben to go with him.

Q.   And is this your typewriting or is this the typewriting of Inspector Erdelatz?

A.   That is mine.

Q.   And did she, that is referring to Antonique, say that the defendant had said anything about leaving town and living with his father?

A.   Yes, he did.

Q.   All right.

I am sorry, did she say that to you that the defendant had said that?

A.   Yes, she said that he told him he might go to

1    Texas to get out from under these guys.

2          MR. CUMMINS:  May I have one more moment, Your Honor?

3    I want to find something.

4          Q.   You spoke to Bencel Bautista just after you spoke

5    to Antonique, is that correct?

6          A.   That is correct.

7          Q.   Did Bencel tell you that earlier on the night of

8    the shooting between 6:00 PM and 7:00 PM that he was with his

9    girlfriend, Antonique Shelton?

10         A.   Yes, he did.

11         Q.   Did Bencel tell you "I spoke with Jesse"--excuse

12    me, strike that.

13         Did Bencel Bautista tell you "After I left Jesse at

14    6:00 PM to 7:00 PM he phoned me about three hours before the

15    shooting."

16         Did Bencel Bautista tell you that?

17         A.   Yes, he did.

18         Q.   Did Bencel Bautista tell you--and this is again

19    on October 5th, of 1987, that the defendant had told him on

20    the night of the shooting that "Some guys from St. Louis were

21    looking for him to kill him, they were jealous of him."

22         A.   Yes, he did.

23         Q.   Did Bencel Bautista tell you that the defendant

24    had said on September 27, 1987, that he, the defendant,

25    wanted Bencel to join him?

26         A.   Yes, he did.

27         Q.   And further that Bencel indicated to you at that

28    time that he had said he couldn't leave then because it was








1    his girlfriend's sister's birthday?

2         Did Bencel tell you that?

3         A.   Yes, he did.

4         MR. CUMMINS:  No further questions, Your Honor.

5                       *Redirect-Examination

6         MR. QUIGLEY:  Q.   These statements that you are

7    talking about, these statements we were just talking about

8    were made by Bencel Bautista, correct?

9         A.   One was by Antonique and one was by Bencel.

10        Q.   But by the two of them?

11        A.   Yes, to Inspector Erdelatz and myself in the car

12   in front of Bautista's house.

13        Q.   And this is what they said the defendant had said

14   to them?

15        A.   Well, some of it and some of it they said

16   directly to me.

17        My purpose in interviewing him was to determine

18   whether or not he was at the scene of this incident and what

19   was his involvement.

20        Q.   Whether who was at the scene?

21        A.   Whether Ben was at the scene of this incident and

22   he said I wasn't there, that the defendant had tried to--had

23   phoned him earlier to try to get him to come but he was tied

24   up with the--a birthday party and he couldn't make it and he

25   said you can ask anybody, I was at my girlfriend's sister's

26   birthday.  I wasn't there.  He tried to get me to help him

27   because he was trying to get out from under some people that

28   he was afraid of from St. Louis that had threatened him.

Q.   Now, Mr. Bautista, did he say to you where the defendant wanted him to go?

A.   No.

Q.   Did he--

A.   He said.

Q.   Did he--I am sorry.  I interrupted you.  I am sorry.

A.   It was my understanding that the defendant wanted Bautista to go with him to be with him because he was anticipating a problem with some people from St. Louis.

Q.   Did you write that down in a statement in the record you made of your conversation with Ben Bautista?

A.   Yes, I did.

Q.   He said he wanted him to go with him?

A.   Yes, he did.

Q.   For protection?

A.   I think so, yes.

Q.   Did he say where?

A.   No, he did not.

Q.   Did he say to do what?

A.   No, he did not.

Q.   Now, did you write or did you type up this statement while you were in the car?

A.   No, I wrote the information on the top of the statement form while I listened to Antonique and I wrote it up immediately upon going back to the office.

Q.   How much time had passed?

A.   I don't recall.  It was--probably would be within

1    motion 1118.1 and that is it.

2         As far as the instructions, let me run through these

3    instructions and I will supplement them at 1:00 o'clock.

4         These are the instructions I have gone over, read and

5    considered; the instructions read and considered, submitted

6    by both sides.

7         1.00, 1.01, 1.02, 1.03.

8         2.00, 2.01, 2.09, 2.11, 2.12, 2.13, 2.20, 2.21, 2.22,

9    2.23, 2.27, 2.51, 2.60, 2.61, 2.71, 2.72, 2.80, 2.81, 2.90,

10   2.91, 2.92.

11        6.00.

12        8.00, 8.10.

13        8.11 will be modified.

14        8.20, 8.30.

15        Counsel both sides I understand informally

16   off-the-record that you are asking that 8.31 not be given.

17   The defense for trial tactic purposes and the prosecutor

18   because he believes that it is inapplicable, second degree

19   murder killing resulting from unlawful act dangerous to life.

20        MR. QUIGLEY:  That is correct, Your Honor.

21        THE COURT:  Is that correct?

22        MR. CUMMINS:  Yes, sir.

23        THE COURT:  And then also no one is asking for 8.55, a

24   proximate cause.

25        MR. QUIGLEY:  That is correct.

26        THE COURT:  And no one is asking for voluntary

27   manslaughter.  And you waive my considering that as an

28   instruction?

1          MR. QUIGLEY:  Yes, sir.

2          MR. CUMMINS:  Yes.

3          THE COURT:  And then we proceed with 8.70, 8.71, 8.73,

4     8.74.

5          At 1:00 o'clock I will tell you what instructions that

6     I intend to give and listen to any objections that you might

7     have regarding 3.31, 3.31.5 and possibly 3.30.

8          And then I will give instructions 2.02, 17.02, 17.19,

9     17.20, 17.30, 17.31, 17.40, 17.41, 17.42, 17.45, 17.47 and

10    17.50.

11         All other instructions that have not been mentioned by

12    this court was either withdrawn by the prosecutor or defense

13    counsel or that either one of you have no objections that any

14    other requested instructions that you have asked have not

15    been given, is that correct?

16         MR. QUIGLEY:  Yes.

17         THE COURT:  All right.

18         MR. CUMMINS:  Your Honor, there are only two other

19    matters that I can think of besides instructions and before

20    the argument.  One is that a couple of exhibits--I think you

21    did ask us if we rested.  There are the bullets I would like

22    to move in.

23         THE COURT:  We will do it in open court.

24         MR. CUMMINS:  Fine, okay.

25         THE COURT:  You have no objection to that?

26         MR. QUIGLEY:  No.

27         THE COURT:  All right.

28         You might have some exhibits too.

1    describe it one through ten backwards and forward, they are

2    witnesses with varying educational background and not used to

3    being in a court with direct and cross-examination.  They

4    tell it as best they can.

5         Sure there are inconsistent on little things and I

6    would submit that if in any case the witnesses weren't

7    inconstent on little things it might be really suspect as to

8    how the particular witnesses had been coached or prepared for

9    their testimony at trial.

10         There are two real keys to this case that I finally

11   submit to you and then I am going to sit down and those are

12   Antonique Shelton, number one, and Bencel Bautista.

13         Bencel as predicted did the walk when he came up to

14   the stand.  I can't imitate it.  Bencel is quite frightened,

15   ladies and gentlemen.

16         Why is he frightened?  Because he goes out into the

17   community every day, into that community of the Tenderloin.

18         I don't recall the testimony if he says he lives down

19   there.  His girlfriend who is pregnant by him also is being

20   called as a witness, he is concerned for her also.

21         And talk about why they might be afraid.  It is

22   perfectly clear, is it not, that when they spoke to Inspector

23   Kenney and Inspector Erdelatz they said that the defendant

24   had made statements to them three hours before the shooting

25   or a couple of hours before the shooting, maybe five hours

26   before the shooting and the defendant said as he told the--as

27   was told to the inspectors, the defendant said some guys from

28   St. Louis are out to get me or out to kill me.

1    Bencel said he didn't know what a contract was but

2    Bencel said that he said something--the defendant said

3    something about a contract, all right?

4    This is the good friend of the defendant and he can't

5    get away, he admitted that on the stand that is what he told

6    to the inspectors and the inspector testified that that was

7    what was told to him.

8    Bencel Bautista saying the defendant is aware that

9    some people from St. Louis were out to kill him or there is a

10   contract out on him.

11   What is that all about?

12   Why are contracts put out on people?  Why are people

13   out to kill other people, hired killers?

14   You talk about that in determining what the defendant

15   does or what his case is all about.

16   Antonique Shelton, and I don't condem her, I am sure

17   defense counsel won't, is scared to death.  She is a very

18   young lady who is about to have a baby.  She lives down in

19   that particular area.

20   It is clear from the testimony, I mean these are

21   kernels of truth that you can build from in this case.  She

22   told the police on October 5th, 1987, that she was in the car

23   and in front of you she got up on the stand, in front of you

24   and she said no the defendant didn't say anything, I didn't

25   hear.  I was kind of asleep.  And she denied making any

26   previous statements to the police in that regard.

27   However, the last thing that I just read to you and I

28   am not going to repeat it right now, it would be available if

1    you asked it to be reread, the day before that she

2    testified--she testified, excuse me, on a Thursday late in

3    the afternoon, that is what I just read and she indicated

4    briefly and essentially yes, the defendant did approach and

5    he said that there are guys from St. Louis out to kill him

6    and that is what she said in response to my questions.

7          And she said that she indicated some further things in

8    response to my questions and then quite clearly the next day

9    she gets on the stand in front of you and says I don't recall

10   saying that, I didn't say that.

11         It is clear that she had said it.  She admitted it

12   under oath on Thursday.

13         It is clear that she said it because the inspector got

14   on the stand and said yes, she told us that.

15         These things; the defendant said that there were

16   people out from St. Louis out to kill her, it is clear that

17   she didn't quite tell it all right on Friday but I

18   understand, she is sixteen and a half or seventeen, she has

19   to go back and live in that community.

20         Figure out what the truth is and then put all of it

21   together:  My initial remarks, the testimony of the witnesses

22   and put it together with this.

23         What a coincidence it is, ladies and gentlemen, that

24   two people are shot, one killed, one shot in the neck, within

25   five hours after the time that the defendant makes these

26   statements that there are some hitmen out to get him, that

27   the defendant is out on the street at that particular time,

28   even though there are hitmen after him, that he approaches

1   too broad a brush.  Perhaps we misstate what they actually

2   testify to.  Perhaps either he or I may make comments to you

3   that you don't particularly like.

4         I do suggest that the way that Mr. Quigley

5   characterized the People's witnesses was too broad a brush,

6   talking about felons and drug addicts well kind of goes with

7   the Tenderloin down in that particular district at 11:00

8   o'clock on a weekend night.

9         You are not going to have the outstanding members of

10  your community.  There were some good people who came and

11  testified.  There are some people who have been convicted of

12  felony who came forward and I brought it out in

13  direct-examination they had prior records but you know this

14  happened in their community, our community.

15        And don't I believe that based on the totality of

16  everything that occurred here, they are telling the truth?

17  Because it is not one or two witnesses or maybe three, but by

18  my calculation at least six witnesses who say the gunman,

19  when you take their testimony as a whole, is that gentleman

20  right there, Mr. Burleson.

21        Again I disagree with defense counsel and I don't

22  raise my voice, I used to do that in days past when I was a

23  young prosecutor, I disagree totally with defense counsel

24  when he says there wasn't a motive because in all the things

25  that Mr. Quigley spoke about he said there was no motive in

26  this case.

27        Well, how can you credit that statement or attach any

28  importance to it when you have the fact, the fact I submit

1    established by the evidence that the defendant said that

2    there were some people out to kill him?

3        What is going on here?  Drug dealing.  Defendant is

4    involved in drugs.  He is living in the fast lane at an early

5    age.  He is caught up in it and rightfully or wrongfully he

6    believes that some people are out to kill him.

7        Defense counsel says well, look at the mindset of the

8    defendant because the defendant is saying I am going to leave

9    town.

10        But my response to that is the defendant said that

11    five hours earlier.  Did he leave town?

12        No.

13        He is right back near to where it should be known,

14    where he lives right outside of that particular place at

15    11:00 o'clock in town, at 11:00 o'clock at night.

16        Is there motive in this case?  Abundant motive and it

17    supplies the whole basis to why this occurred.

18        And an even more tragic thing than just that a person

19    was killed is that the defendant killed the wrong people.

20        Why would the defendant think that they were hitmen?

21        Well, as indicated by Mark Ellis, Mark Ellis had only

22    seen the defendant maybe twice before, so the defendant

23    inferentially had only seen Mark Ellis twice before.  The

24    defendant thought this was one of the guys that was from

25    out-of-town.

26        As to whoever the shooter would be, was he insane?

27    Life in the world of narcotics is a very rough world, whereas

28    I indicated before life is cheap and you do bold things,

1  report and one that is very obvious that we have a 19 year
2  old.

3          (To the Bailiff)  You can keep the door open, we have
4  no security risk here in this case.

5          I think there are circumstances in mitigation.  We
6  have a 19 year old who has been involved in community
7  services not constantly dotted with criminality but that is
8  one factor of mitigation.

9          Number two, I would indicate that the acts that he
10  did, and I agree with the jury, were not acts of
11  premeditation but acting out of fear because of what he
12  believed were threats upon his own life.  I can only
13  speculate as to whether or not it was a threat because of
14  some infringement of some turf control of what areas to be
15  controlled for crack cocaine dealing or not, but there was
16  some threats; there was some evidence about people from St.
17  Louis or someone from state prison.

18          In any event, it appeared the defendant was interested
19  in getting a gun.

20          Here is a bright, articulable person that should never
21  have been near a gun.  He deserved to be near a computer or
22  with a pen.

23          Those are the circumstances.

24          Now, the circumstances in aggravation appeared to be
25  factors that his juvenile probation was unsatisfactory under
26  California rule 421(b)(5).  In 1980 he was--petition was
27  sustained as to an auto theft and he was placed on probation.

28          On October 1st, 1981, he committed a grand theft from

Jesse C. Burleson
#T 90284 (A4-101-L)
P.O. Box 409020
Ione, CA 95640

Confidential

Clerk of the United States District Court
for the Northern District of California
450 Golden Gate Avenue
P.O. Box 36060
San Francisco, CA 94102